## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN HVIDSTEN and SAVERIA GARCIA-MACRI, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>          v.<br><br>NORTHWELL HEALTH, INC.,<br><br>    Defendant. | Case No. 23-8538<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs John Hvidsten and Saveria Garcia-Macri ("Plaintiffs"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through their attorneys, bring this Class Action Complaint against Defendant Northwell Health, Inc. ("Northwell") and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

## INTRODUCTION

1.     Plaintiffs bring this class action against Northwell for its failure to secure and safeguard the personally identifying information ("PII") and personal health information ("PHI") of Plaintiffs and approximately 3.9 million other individuals, including their names, Social Security numbers, dates of birth, addresses, medical record numbers, encounter numbers, medical information, and dates and times of medical services.

2.     Northwell is the largest health system in New York.

3.     Between approximately March 27, 2023, and May 2, 2023, an unauthorized third party gained access to the network system of one of Northwell's vendors (Perry Johnson &

Associates, Inc., or "PJ&A") and obtained files containing information about Northwell's current and former patients (the "Data Breach").

4.      Northwell owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Northwell breached that duty by, among other things, failing to ensure that its vendor implemented and maintained reasonable security procedures and practices to protect Northwell's patients' PII/PHI from unauthorized access and disclosure.

5.      As a result of Northwell's inadequate security measures and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred between approximately March 27, 2023, and May 2, 2023.

6.      Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violations of the New York's Deceptive Acts and Practices statute, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

*Plaintiff John Hvidsten*

7.      Plaintiff John Hvidsten is a citizen of New York.

8.      Plaintiff Hvidsten obtained healthcare or related services from Northwell. As a condition of receiving services, Northwell required Plaintiff Hvidsten to provide his PII/PHI.

9.     Based on representations made by Northwell, Plaintiff Hvidsten believed Northwell had implemented and maintained reasonable security and practices to protect his PII/PHI. With this belief in mind, Plaintiff Hvidsten provided his PII/PHI to Northwell in connection with receiving healthcare services provided by Northwell.

10.     Plaintiff Hvidsten takes great care to protect his PII/PHI. Had Plaintiff Hvidsten known that Northwell does not adequately protect the PII/PHI in its possession, including by contracting with companies that do not adequately protect the PII/PHI in its possession, he would not have obtained healthcare services from Northwell nor agreed to entrust it with his PII/PHI.

11.     Plaintiff Hvidsten received a letter from PJ&A notifying him that his PII/PHI was accessed in the Data Breach.

12.     As a direct result of the Data Breach, Plaintiff Hvidsten has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; deprivation of the value of his PII/PHI; and overpayment for services that did not include adequate data security.

***Plaintiff Saveria Garcia-Macri***

13.     Plaintiff Saveria Garcia-Macri is a citizen of New York.

14.     Plaintiff Garcia-Macri obtained healthcare or related services from Northwell. As a condition of receiving services, Northwell required Plaintiff Garcia-Macri to provide her PII/PHI.

15.     Based on representations made by Northwell, Plaintiff Garcia-Macri believed Northwell had implemented and maintained reasonable security and practices to protect her

PII/PHI. With this belief in mind, Plaintiff Garcia-Macri provided her PII/PHI to Northwell in connection with receiving healthcare services from Northwell.

16.     Plaintiff takes great care to protect her PII/PHI. Had Plaintiff Garcia-Macri known that Northwell does not adequately protect the PII/PHI in its possession, including by contracting with companies that do not adequately protect the PII/PHI in its possession, she would not have obtained healthcare services from Northwell nor agreed to entrust it with her PII/PHI.

17.     Plaintiff Garcia-Macri received a letter from PJ&A notifying her that her PII/PHI was accessed in the Data Breach.

18.     As a direct result of the Data Breach, Plaintiff Garcia-Macri has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; and overpayment for services that did not include adequate data security.

***Defendant Northwell Health, Inc.***

19.     Defendant Northwell Health, Inc. is a New York not-for-profit corporation with its principal place of business at 2000 Marcus Avenue, New Hyde Park, NY 11042.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Northwell's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

21.     This Court has personal jurisdiction over Defendant Northwell Health, Inc., because it is incorporated under the laws of New York, has its principal place of business in New York, and does significant business in New York.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Northwell has its principal place of business in this District and a substantial part of the events giving rise to Plaintiffs' claims arose in this District.

**FACTUAL ALLEGATIONS**

***Overview of Northwell***

23.     Northwell is the largest health system in New York.[1] It employs more than 85,000 people at over 900 locations, including 21 hospitals.[2]

24.     In the regular course of its business, Northwell collects and maintains the PII/PHI of its current and former patients. Northwell required Plaintiffs and Class members to provide their PII/PHI as a condition of receiving healthcare services from Northwell.

25.     On its website, Northwell claims that "patients are our number one priority and we believe that patient privacy is an integral part of the health care we provide to you."[3] Northwell states, "To ensure the development of a lasting bond of trust with our patients, we have many safeguards to protect the privacy and security of your personal information."[4] Northwell further promises that "[w]e also have many policies in place to protect the privacy and security of your personal information and our employees are educated from the moment they are hired and continually after, to respect and protect our patient's privacy."[5]

---

[1] *About Northwell*, NORTHWELL HEALTH, https://www.northwell.edu/about-northwell (last accessed Nov. 15, 2023).

[2] *Id.*

[3] *Patient Privacy Overview*, NORTHWELL HEALTH, https://www.northwell.edu/about-northwell/commitment-to-excellence/protecting-patient-privacy (last accessed Nov. 15, 2023).

[4] *Id.*

[5] *Id.*

26.    Northwell's website contains a Notice of Privacy Practices ("Privacy Policy") that "explains how we fulfill our commitment to respect the privacy and confidentiality of your protected health information."[6] In the Privacy Policy, Northwell admits it is "required by law to make sure that information that identifies you is kept private."

27.    The Privacy Policy includes a list of the ways Northwell may use and disclose its patients' health information, including for treatment, payment, and health care operations, among others.[7] The Privacy Policy promises that disclosures not described in the Notice or permitted by law will be made only with patients' written authorization.[8]

28.    Northwell provided PJ&A with Plaintiffs' and Class members' PII/PHI for medical transcription and dictation services.[9]

29.    Plaintiffs and Class members are current or former patients of Northwell and entrusted Northwell with their PII/PHI.

---

[6] *Notice of Privacy Practices*, NORTHWELL HEALTH, https://www.northwell.edu/sites/northwell.edu/files/2023-09/notice-of-privacy-practices-english-23.pdf (last accessed Nov. 15, 2023).

[7] *Id.*

[8] *Id.*

[9] *See* Kevin Vesey, *Cyberattack Targets Northwell Health Vendor; Patient Data Compromised*, NEWS12 (Nov. 9, 2023 6:52 PM), https://longisland.news12.com/northwell-health-vendor-patient-information-may-have-been-impacted-by-data-breach.

*The Data Breach*

30.     Between approximately March 27, 2023, and May 2, 2023, "[a]n unauthorized party gained access to the PJ&A network . . . and, during that time, acquired copies of certain files from PJ&A systems."[10]

31.     According to the Notice of Data Security Incident posted on PJ&A's website, the PII/PHI affected in the Data Breach included names; dates of birth; addresses; medical record numbers; hospital account numbers; admission diagnoses; dates and times of service; Social Security numbers; insurance information; clinical information such as laboratory and diagnostic testing results, medications, treatment facility names, and healthcare provider names.[11]

32.     Northwell's Notice of Privacy Practices states: "You have a right to be notified in the event of a breach of the privacy of your unsecured protected health information by Northwell Health or its business associates."[12] It promises patients that they "will be notified as soon as reasonably possible, but no later than 60 days following our discovery of the breach."[13] PJ&A informed Northwell of the Data Breach on July 21, 2023,[14] but Northwell failed to notify its patients until early November 2023, over three months later.

33.     Northwell's failure to promptly notify Plaintiffs and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited

---

[10] *Cyber Incident Notice*, PERRY JOHNSON & ASSOCS., https://www.pjats.com/downloads/Notice.pdf (last accessed Nov. 15, 2023) [hereinafter "*PJ&A Notice*"].

[11] *Id.*

[12] *Notice of Privacy Practices*, *supra* note 6.

[13] *Id.*

[14] Vesey, *supra* note 9.

those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiffs and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### Northwell Knew that Criminals Target PII/PHI

34.     At all relevant times, Northwell knew, or should have known, that the information it collected was a target for malicious actors. Despite such knowledge, Northwell failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from cyber-attacks that Northwell should have anticipated and guarded against.

35.     It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[15]

36.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2023 report, the healthcare compliance company Protenus found that there were 956 medical data breaches in 2022 with over 59 million patient records exposed.[16] This is an

---

[15] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[16] *See 2023 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last accessed Nov. 15, 2023).

increase from the 758 medical data breaches, which exposed approximately 40 million records, that Protenus compiled in 2020.[17]

37.    PII/PHI is a valuable property right.[18] The value of PII/PHI as a commodity is measurable.[19] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[20] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[21] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years after acquiring the PII/PHI.

38.    As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be

---

[17] *See id.*

[18] *See* Marc van Lieshout, *The Value of Personal Data*, 457 INT'L FED. FOR INFO. PROCESSING 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[19] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[20] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[21] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

readily aggregated with other such data, and become more valuable to thieves and more damaging to victims.

39.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[22] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics."[23]

40.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[24] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[25]

41.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[26] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted

---

[22] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer of Carbon Black, stating, "Health information is a treasure trove for criminals.").

[23] *Id.*

[24] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[25] *See* FBI, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[26] Steager, *supra* note 22.

disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[27]

42.     Consumers place a high value on the privacy of their data, as they should. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[28]

43.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

44.     Theft of PII/PHI can have serious and lasting consequences for the victim. The FTC warns consumers that identity thieves can use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[29, 30]

45.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other

---

[27] *Id.*

[28] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[29] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 15, 2023).

[30] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[31]

46.    Identity theft and the resulting consequences are not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[32]

47.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave [] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[33] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[34] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[35] The FTC also warns: "If the thief's health information is mixed with yours it

---

[31] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[32] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Nov. 15, 2023).

[33] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[34] *See* FBI, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 25.

[35] *See What to Know About Medical Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Nov. 15, 2023).

could affect the medical care you're able to get or the health insurance benefits you're able to use."[36]

48.    Theft of SSNs also creates a particularly alarming situation for victims because SSNs cannot easily be replaced. In order to obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of her SSN. Thus, a new SSN will not be provided until after the victim has already suffered harm.

49.    Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g. name, address, date of birth) is akin to gaining a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[37]

50.    A report published by the World Privacy Forum and presented at the U.S. FTC Workshop on Informational Injury describes what victims of medical identity theft may experience:

    a.    Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

    b.    Significant bills for medical goods and services neither sought nor received.

    c.    Issues with insurance, co-pays, and insurance caps.

    d.    Long-term credit problems based on problems with debt collectors reporting debt.

---

[36] *Id*.

[37] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

e.    Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; and victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f.    As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for a mortgage or other loans and may experience other financial impacts.

g.    Phantom medical debt collection based on medical billing or other identity information.

h.    Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[38]

51.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes three months for consumers to discover their identity has been stolen and used, but it can take individuals up to three years to learn this information.[39]

### *Damages Sustained by Plaintiffs and Class Members*

52.    Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention and detection of, and recovery from, unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in Northwell's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the

---

[38] *See* Dixon & Emerson, *supra* note 33.

[39] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for services they received without adequate data security.

## **CLASS ALLEGATIONS**

53.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

54.    Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

> All United States residents whose personally identifiable information or personal health information was in the possession of Northwell and was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

55.    Excluded from the Class are Northwell Health, Inc. and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; as well as the judge(s) presiding over this matter and the clerks of said judge(s).

56.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

57.    The members of the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Northwell initially indicated that approximately 3.9 million persons were affected by the Data Breach.[40]

58.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

---

[40] *See* Vesey, *supra* note 9.

a. whether Northwell had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure;

b. whether Northwell had duties not to disclose the PII/PHI of Plaintiffs and Class members to unauthorized third parties;

c. whether Northwell failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII/PHI;

d. whether an implied contract existed between Class members and Northwell, providing that Northwell would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e. whether Northwell engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiffs and Class members;

f. whether Northwell breached its duties to protect Plaintiffs' and Class members' PII/PHI; and

g. whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

59. Northwell engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

60. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Northwell, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

61. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with

substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

62.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Northwell, so it would be impracticable for Class members to individually seek redress from Northwell's wrongful conduct.

63.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer case management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I
## NEGLIGENCE

64.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

65.    Northwell owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

66.    Northwell knew or should have known the risks of collecting and storing Plaintiffs' and all other Class members' PII/PHI, the importance of maintaining secure systems, and the importance of ensuring vendors maintained this security. Northwell knew or

should have known of the many data breaches that targeted healthcare provides that collect and store PII/PHI in recent years.

67.     Given the nature of Northwell's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, Northwell should have identified the vulnerabilities to its systems or its third-party vendor's systems and prevented the Data Breach from occurring.

68.     Northwell breached its duties by failing to, or contracting with companies that failed to, exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiffs' and Class members' PII/PHI.

69.     It was reasonably foreseeable to Northwell that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

70.     But for Northwell's negligent conduct or breach of the duties described above and owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

71.     As a result of Northwell's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in

the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in Northwell's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services they received without adequate data security.

<u>COUNT II</u>
**NEGLIGENCE PER SE**

72.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

73.    Northwell's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

74.    Northwell's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Northwell, of failing to employ reasonable measures to protect and secure PII/PHI.

75.    Northwell violated HIPAA Privacy and Security Rules, Section 5 of the FTCA by failing to, or contracting with companies that failed to, use reasonable measures to protect Plaintiffs' and other Class members' PII/PHI, by failing to provide timely notice, and by not

complying with applicable industry standards. Northwell's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

76.    Northwell's violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

77.    Plaintiffs and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

78.    The harm occurring as a result of the Data Breach is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Breach.

79.    It was reasonably foreseeable to Northwell that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

80.    The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Northwell's violations of the HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and Class members have suffered and will suffer injury,

including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in Northwell's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services they received without adequate data security.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**

81.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

82.     Plaintiffs and Class members gave Northwell their PII/PHI in confidence, believing that Northwell would protect that information. Plaintiffs and Class members would not have provided Northwell with this information had they known it would not be adequately protected. Northwell's acceptance and storage of Plaintiffs' and Class members' PII/PHI created a fiduciary relationship between Northwell and Plaintiffs and Class members. In light of this relationship, Northwell must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiffs' and Class members' PII/PHI.

83.     Due to the nature of the relationship between Northwell and Plaintiffs and Class members, Plaintiffs and Class members were entirely reliant upon Northwell to ensure that their PII/PHI was adequately protected. Plaintiffs and Class members had no way of verifying or influencing the nature and extent of Northwell's or its vendor's data security policies and practices, and Northwell was in an exclusive position to guard against the Data Breach.

84.     Northwell has a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of their relationship. It breached that duty by contracting with companies that failed to properly protect the integrity of the system containing Plaintiffs' and Class members' PII/PHI, failed to comply with the data security guidelines set forth by HIPAA, and otherwise failed to safeguard Plaintiffs' and Class members' PII/PHI that it collected.

85.     As a direct and proximate result of Northwell's breaches of its fiduciary duties, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in Northwell's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services they received without adequate data security.

## COUNT IV
## BREACH OF IMPLIED CONTRACT

86.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

87.     In connection with receiving healthcare services, Plaintiffs and all other Class members entered into implied contracts with Northwell.

88.     Pursuant to these implied contracts, Plaintiffs and Class members paid money to Northwell, directly or through their insurance, and provided Northwell with their PII/PHI.

In exchange, Northwell agreed to, among other things, and Plaintiffs and Class members understood that Northwell would, *inter alia*: (1) provide services to Plaintiffs and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII/PHI; and (3) protect Plaintiffs' and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

89.    The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and Northwell, on the other hand. Indeed, as set forth above, Northwell recognized the importance of data security and the privacy of Northwell's patients' PII/PHI. Had Plaintiffs and Class members known that Northwell would not adequately protect their PII/PHI, they would not have sought nor chosen to receive healthcare or other services from Northwell.

90.    Plaintiffs and Class members performed their obligations under the implied contract when they provided Northwell with their PII/PHI and paid for healthcare or other services from Northwell.

91.    Northwell breached its obligations under its implied contracts with Plaintiffs and Class members by failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, including by ensuring companies it contracts with implement and maintain reasonable security measures to protect PII/PHI, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

92.    Northwell's breach of its obligations of its implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class members have suffered from the Data Breach.

93.    Plaintiffs and all other Class members were damaged by Northwell's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost or they will lose time and money mitigating and remediating the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they overpaid for services they received without adequate data security.

## COUNT V
## UNJUST ENRICHMENT

94.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

95.    This claim is pleaded in the alternative to the breach of implied contract claim.

96.    Plaintiffs and Class members conferred a monetary benefit upon Northwell in the form of monies paid to Northwell for healthcare services and through the provision of their PII/PHI.

97.    Northwell accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class members. Northwell also benefitted from the receipt of Plaintiffs' and Class members' PII/PHI, as this was used to facilitate billing services and services provided to Northwell.

98.    As a result of Northwell's conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the difference in value between services with reasonable data privacy and security practices and procedures (which Plaintiffs and Class members expected), and

the value of those services without reasonable data privacy and security practices and procedures (which they received).

99.     Northwell should not be permitted to retain the money belonging to Plaintiffs and Class members because Northwell failed to adequately implement the data privacy and security procedures that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

100.    Plaintiffs and Class members have no adequate remedy at law.

101.    Northwell should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by Northwell as a result of the conduct and Data Breach alleged herein.

## <u>COUNT VI</u>
## VIOLATIONS OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES STATUTE, N.Y. General Business Law ("GBL") § 349

102.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

103.    New York General Business Law § 349(a) states, "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

104.    Northwell is a "person, firm, corporation or association or agent or employee thereof" within the meaning of the GBL. N.Y. GBL § 349(b). At all relevant times, Northwell was engaged in "business," "trade," or "commerce" within the meaning of the GBL. *See* N.Y. GBL § 349(a).

105.    Plaintiffs and Class members are "persons" within the meaning of General Business Law § 349(h).

106.    Northwell promised to protect, but subsequently failed to adequately safeguard and maintain, Plaintiffs' and Class members' PII/PHI. Northwell failed to notify Plaintiffs and other Class members that, contrary to its representations about valuing data security and privacy, it does not maintain adequate controls to protect their PII/PHI, including by ensuring that the companies it contracts with maintain adequate data protection practices.

107.    Had Plaintiffs and Class members been aware that Northwell omitted or misrepresented facts regarding the adequacy of its data security safeguards, Plaintiffs and Class members would not have accepted services from Northwell.

108.    Northwell's failure to make Plaintiffs and Class members aware that it would not adequately safeguard their information, while maintaining that it would, is a "deceptive act or practice" under N.Y. GBL § 349.

109.    Plaintiffs and all other Class members were damaged by Northwell's unfair and deceptive trade practices because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost or they will lose time and money mitigating and remediating the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they overpaid for services they received without adequate data security.

110.    Pursuant to General Business Law § 349(h), Plaintiffs seek damages on behalf of themselves and Class members in the amount of the greater of actual damages or $50 for

each violation of N.Y. General Business Law § 349. Because Northwell's conduct was committed willfully and knowingly, Plaintiffs and Class members are entitled to recover up to three times their actual damages, up to $1,000.

## REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Northwell as follows:

A.    certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.    awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Northwell from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: November 16, 2023

Respectfully submitted,

/s/ *Adam Pollock*
Adam Pollock
**POLLOCK COHEN LLP**
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
adam@pollockcohen.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
(312) 621-2000
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
(866) 252-0878
gklinger@milberg.com

*Attorneys for Plaintiffs and the Proposed Class*

**pro hac vice forthcoming*